## CATHOLIC UNIVERSITY OF AMERICA, Appellant, v. O'BRIEN et al.

### Division Two, March 23, 1904.

1. **WILL: Capacity: Test.** The test of capacity to make a will is that the testator be capable of comprehending all of his property and all persons who reasonably come within the range of his bounty, and have sufficient intelligence to comprehend his ordinary business, and to know what disposition he is making of his property.

2. ———: ———: **Monomaniac: Advanced Age: Peremptory Instruction.** The testator was a man of more than ordinary intelligence, was quite well educated, was well informed, and something over seventy years old. He went to his attorney to prepare the contents of the will, stating the names of his legatees, the amounts he wished to give each, and the attorney outlined the will for him in pencil, and with that as a memorandum he went away, drew it up himself, and in a short time returned, and asked the attorney and a friend to witness it for him, first telling them it was his will. He had drawn up papers of the same kind before about which he consulted the same attorney, and at the time he asked for the outline of the will in suit said he had changed his mind about the disposition of his property. He had in the former wills made bequests to a daughter, but had afterwards become angry at her marriage. He chose his own executor, a discreet business man. He was feeble from advanced age, but seemingly not unusually so for men of his age. He suffered from vertigo, catarrh and heart trouble, and drank whiskey, but was not a drunkard. The attorney who drew the outline of his will stated he was a monomaniac on the disposition of his property, but that he knew what he was doing when he made his will, knew his children, and what disposition he was making of his property, and mentioned in so many words what he wanted to do with it, and in such a way that he understood how to make the draft of the will so as to carry out his intention. Nothing was disclosed in the evidence which tended to show that the testator was not in the full possession of all his mental faculties at the time he executed the will. *Held*, that the testimony of the attorney that he was a monomaniac amounts to nothing, and that the court should have given a peremptory instruction to the jury that the holograph was the testator's will.

3. ———: ———: Injustice to Children. However unjust a testator may be to his children, if he is competent to make the will, he has the right to dispose of his property as he pleases, in the absence of undue influence and fraud.

Appeal from Lawrence Circuit Court.—*Hon. Henry C. Pepper*, Judge.

REVERSED AND REMANDED (*with directions*).

*Thos. Carlin, R. H. Landrum* and *Henry Brumback* for appellant.

(1) Upon all the facts given in evidence, there is nothing to sustain the conclusion that the testator was not possessed of all the qualifications of memory and of knowledge necessary to qualify him to make a will, or that he did not act deliberately and intelligently in making the will in question, and the will was formally executed. There was nothing for the jury to pass upon. Cash v. Lust, 142 Mo. 630; Sehr v. Lindenman, 153 Mo. 276; Wood v. Carpenter, 166 Mo. 465; Martin v. Bowdern, 158 Mo. 379; Riggin v. Westminster College, 160 Mo. 570; Campbell v. Carlisle, 162 Mo. 634; Fullbright v. Perry County, 145 Mo. 432; McFadin v. Catron, 138 Mo. 197. (2) The first instruction given for defendants is confusing and erroneous. While it may properly enough define what degree of mental capacity was required of the testator, it was error in the state of the evidence, after the plaintiff had proved the formal execution of the will and that testator knew what property he had and what he was doing with it and who his children were, to instruct the jury that such burden still rested on plaintiff. The burden had been shifted to defendants. Fullbright v. Perry County, 145 Mo. 442; McFadin v. Catron, 138 Mo. 213. Such instruction is further erroneous and confusing, because, after this premise, it goes on to instruct, therefore (for that reason) "if the jury finds that the will produced be not the

will of Maurice O'Brien, their verdict may be in the following form." This language was evidently meant to give, and doubtless did give, the jury the impression that they must find their verdict as therein recited. The second instruction for the defendants was clearly a comment on the evidence. McFadin v. Catron, 120 Mo. 274; Fine v. St. Louis Public Schools, 39 Mo. 67; Choquette v. Barada, 28 Mo. 491; Oil Well Supply Co. v. Wolfe, 127 Mo. 626; Hoffman v. Hoffman's Executor, 126 Mo. 498. The third instruction for defendant may have been appropriate to the case of Farmer v. Farmer, 129 Mo. 530, from which it is copied; but in the present case there was no evidence upon which to base it.

*W. Cloud* for respondent.

There is substantial testimony to support the verdict, and since the law has provided that the question shall be submitted to a jury, and that the verdict shall be final except as to errors of law, it should not be disturbed. There is no error in the instructions. Taken. altogether the law is fairly stated, and nothing calculated to prejudice the jury against plaintiff was given in the instructions of the court. Lyne v. Marcus, 1 Mo. 410; Young v. Redenbaugh, 67 Mo. 589; Appleby v. Brock, 76 Mo. 314; Garland v. Smith, 127 Mo. 567; Moore v. McNalty, 164 Mo. 111; Muller v. St. Louis Hospital Assn., 5 Mo. App. 390; s. c., 73 Mo. 242.

BURGESS, J.—This is an action by plaintiff, one of the legatees named in the will of Maurice O'Brien, deceased, to have said will, which had been rejected by the probate court of Lawrence county, where O'Brien lived at the time of his death, proved, as provided by section 4622, Revised Statutes 1899. Upon issue joined in the court below the trial resulted in a verdict and judgment for defendants, from which plaintiff, after

filing motion for a new trial and the same being' over-ruled, appeals.

Maurice O'Brien was seventy-three years of age at the time of the execution of the will. He had lived in Pierce City, Lawrence county, for many years, and died there in 1895, the owner of real and personal property located there, and of real property in Chicago. In November, 1894, he executed the will in question. At that time F. C. Johnson was a lawyer residing in Pierce City. He had assisted in drafting a previous will for Maurice O'Brien. O'Brien went to his office and instructed him how he wished to dispose of his property, and employed him to put the will in question in form; he returned later, and took away the draft Johnson had made, wrote it out in his own hand, and later brought back this holograph will and signed it at Johnson's office and had Johnston and Otis C. Maxey, who was reading in the office, to sign as witnesses. He left surviving him, one son, Thomas Joseph, and two daughters, Mary and Alice. He was a Catholic. By this will he (1) provides for payment of his debts and gives $20 to Father Healy and $10 to Father Thomas, to say masses for the repose of his soul and of his deceased son; (2) gives his son, Thomas Joseph, $2,000, and his daughter, Mary, $1,000, and his dwelling in Pierce City, furniture, piano, etc., and to his daughter Alice nothing; (3) gives his nephew John H. O'Brien, and his sister $300 each, and to his brother Richard's widow $300, and to his cousin, Mrs. Patrick Power, $200; (4) gives the Mission of the Immaculate Virgin for the protection of homeless and destitute children, a corporation of New York, $500; (5) gives to Charles A. Vissani, or his successor as commissary of the Order of St. Francis, etc., $500; (6) directs $25 to be deposited in Lawrence County Bank to be used to keep his cemetery lot in order; and (7) gives the residue of his property to the Catholic University of America.

February 14, 1895, this will was presented to the

probate court of Lawrence county, for probate, and the probate court rejected it "for the reason that his mental condition was such that he was incompetent to make a will."

The present action to prove and establish such will was brought by the Catholic University of America in the circuit court of Lawrence county against all the heirs and all the beneficiaries under such will of said deceased. The petition was filed June 22, 1898, and all the defendants were brought into court to answer to the August term, 1898, several of them by summons, and the others by order of publication. An amended petition was filed February 13, 1900. The amended petition differs from the original only by the allegation that "said Maurice O'Brien at the time of his death left real estate and personal property located in said county of Lawrence in the State of Missouri, and this action affects the establishment of the lawful right thereto." The petition alleges in substance that plaintiff is a corporation; that Maurice O'Brien died January 1895, a resident of Lawrence county, Missouri, testate; that on November 17, 1894, he was upward of twenty-one years of age, of sound mind and competent under the laws of Missouri to make his will, and did make his will in writing, signed by him and attested by two competent witnesses, viz., F. C. Johnson and Otis C. Maxey, subscribing their names to such written will in the presence and at the request of the testator; that on February 14, 1895, such will was presented to the probate court of said county for proof and was on such date by such court rejected; that the said written, subscribed and attested paper is the last will of Maurice O'Brien; that he left him surviving, his sole children (and descendants of deceased children) Thomas Joseph O'Brien, Mary Kiely and Alice Daily; alleges the disposition he made of his property, the same as above recited; that the defendant Eliza A. O'Brien claims to be the widow of deceased and is made party for that

reason, but is not his widow, but was legally divorced in his lifetime, and in the decree all her rights to and in his estate, living and dead, were finally determined; that deceased left property located in said Lawrence county; that said Thomas Joseph O'Brien, Mary Kiely, John H. O'Brien, Alice O'Brien, Mrs. Richard O'Brien, Ellen Meany Power, otherwise known as Mrs. Patrick Power, The Mission of the Immaculate Virgin, etc., Godfrey Schilling, Commissary, etc., are non-residents of Missouri; and asks that said will may be proved, and an issue be made up whether the said writing be the will of Maurice O'Brien or not.

Defendants, Lewis L. Allen, Thomas Lustenberger, The Lawrence County Bank, Eliza O'Brien, Daniel Healy, and Alice Daily were served with summons; all the other defendants by publication.

August 23, 1900, Alice Daily and Eliza O'Brien filed their separate answer, alleging that they deny all allegations, not specifically admitted; admit the death of Maurice O'Brien and that Thomas, Mary and Alice are his sole surviving children; aver that if Maurice O'Brien did sign the instrument propounded as his will, then at the time of signing the writing mentioned in the amended petition, said Maurice O'Brien was of unsound mind and was not capable of making a will and was unduly influenced in signing the same; that at the time of the order of publication more than five years had elapsed since the rejection of the will by the probate court; and assert no information whether plaintiff is a corporation or not, and deny it.

L. L. Allen filed his separate answer denying all the allegations of the petition.

All the other defendants failed to plead.

August 23, 1900, plaintiff filed replication, denying all allegations of new matter in the answer of Alice Daily and Eliza O'Brien.

F. C. Johnson, one of the attesting witnesses, testified that Maurice O'Brien was over twenty-one years

of age. He owned his dwelling house in Pierce City, and notes and money, and had property in Chicago. The last years of his life he was in quite feeble health; he stayed about home most of the time; of course he came down town occasionally, frequently came to my office; I had some little business with him from time to time; he seemed to be a man of considerable information; appeared to be a man that at one time had been quite well educated; in later years he was not so strong and didn't appear to take so much interest in matters generally; think he took some newspapers; he was a man who was inclined to pay attention to what was going on; he was a very pleasant man to have about, a good conversationalist, and pretty well informed; that was some years back that I have reference to; he didn't go about very much and was not in my office very much the last year or so of his life. (Examining the will): This is the will. This is the will he wrote. I think, I prepared the contents of it. I outlined it for Mr. O'Brien only a short time before it was signed. It was signed in my office the 17th day of November, 1894. The entire paper is in the handwriting of Mr. O'Brien. He wrote his name to it in my presence and the presence of Otis C. Maxey. I wrote the attestation clause in my handwriting. My name and that of Mr. Maxey were attached at request of Mr. O'Brien. He said the paper was his will. He was at my office a few days before the signing of this paper; he had made papers of this kind before and consulted me about the manner of getting them up; but he always wanted to write them himself so it would appear in his own handwriting. He said he wanted me to prepare another will for him; he said he had changed his mind about the disposition of his property, and he wanted me to go over it with him and outline another will. I did it in writing in pencil. He mentioned the names of his children; he designated all the parties, devisees and legatees named in the will. He said he wanted his property to go to the parties

whose names appear in this paper.  Mr. O'Brien knew the names of his children and all the other people.  This will is quite different from the others I assisted in preparing.  He was in the office more than once; as many as twice; it might have been an hour at a time.  Part of the time he would appear to be free from nervousness, and at others he would get excited and get up and walk about the office while he was giving his directions. Some of his domestic affairs hadn't gone to suit him; it appeared his daughter had married against his will. He cut her off.  He selected Allen as executor at his own suggestion.  Allen is an experienced, discreet business man.

On cross-examination, he said:  I remember something of the circumstances of him hiding out $1,000 in a can and losing it, the time his wife got a divorce.  I should say I had assisted him in preparing five or six wills; the last previous one not more than a year or two before this one.  His daughter, Alice, had lived with him.  Previous to that his son Frank had lived with him, and had died.  His divorced wife lived in Pierce City.  Mrs. Kieley, Mrs. Daily, Frank and Thomas Joseph were his only children I knew of.  He provided for Alice in his previous will.  She married only a short time before he signed this will.  He would speak about his wife and the death of his son, Frank, and then that the marriage of his daughter broke up his home.  He was not satisfied with her marriage.  The principal thing he spoke of was that she didn't stay at home and keep house for him.  He was a very devout Catholic. The last year or so he failed quite rapidly.  He complained a good deal of his head; he spoke something about his stomach being out of order.  He was not as companionable as he had been.  When he came in the first time to have this last will prepared after his daughter had married, he walked in somewhat hurriedly and sat down and did not say anything for a good little while, and got up and walked about the room a time or

two before he said anything, frequently putting his hand to his head, saying something under his breath that I couldn't understand. I simply saw he was laboring under considerable excitement of some kind. He told me what he wanted to do, and said, "You fix it up and I will write it up myself," and my recollection is, he came the second time before he was through with the outline of the paper he prepared. He told me what he wanted done and I outlined it myself and I think in the form it is there. He had the old will with him and tore it up and stuck it in the stove. He didn't look at it but very little. He seemed to want to make it very different from what it was before. My opinion is this University wasn't mentioned in the former will. I should judge him to be seventy years old. He said in the will he was seventy-three. A day or two after his second visit, he brought the will, written off in his handwriting; he laid it down and said he was ready to have it signed. He said it was his will and asked me if Mr. Maxey and I would witness it. I prepared the attestation clause and we signed it at his request and in his presence. He probably remained half an hour. His residence was a little over three blocks from my office, and my office was upstairs.

Otis C. Maxey, the other attesting witness, said: I saw Mr. O'Brien sign his name to the paper (in question); F. C. Johnson and I signed it as witnesses at his request. My understanding was that he had Mr. Johnson outline the will for him and this memorandum was given to Mr. O'Brien and the will was written by himself. Mr. O'Brien told Mr. Johnson to whom he wanted to give his property. He seemed to be in feeble health.

Dr. Thomas J. Conaty said: I am director and president of the Catholic University of America. I knew Charles A. Vissani, named in the will of Maurice O'Brien; he is dead; Godfred Schilling is his successor in the office named.

Daniel Healey said: In 1894 I was in charge of the Catholic church at Pierce City; among Catholics I was commonly known by the name Father Healey, and I am the person referred to by that name in the will of Maurice O'Brien. I knew Father Thomas Lustenberger; he was commonly known by the name Father Thomas. I knew Maurice O'Brien; he died January 10, 1895; I saw him a few hours before his death; his mental condition seemed to be good; I think I must have met him in November, 1894; I usually saw him twice a week, and sometimes oftener; he had been suffering a long time with indigestion and heart trouble and might have been weaker than men of his age would have been, free from diseases; he left three living children; his other child had died about a year previous to his death; after he and his wife separated his son Francis kept house for him till his death; and after that his daughter Alice, until her marriage; after her marriage none of his family lived with him; he had a good education for a man of his avocation; he had a good library; he took a great deal of interest in the Gallic language; he spoke and read it very well; he gave me lessons in it; it is a difficult language, harder than Greek; in 1894 and up to his death he had a very good memory, I believe. On cross-examination: He suffered a great deal at times, and was never perfectly well the last year of his life; I remember of the marriage of his daughter in November, 1894; I officiated.

A certified copy of the certificate of incorporation of the Catholic University of America was put in evidence.

A transcript was put in evidence of the decree rendered September 14, 1885, in the circuit court of Barry county, Missouri, in the case of Eliza A. O'Brien against Maurice O'Brien, divorcing her, and decreeing $1,100 in gross as alimony ''which sum is to be in full satisfaction and settlement, release and discharge of all right, present or prospective, which plaintiff has

had or may have as the wife of defendant, either at law or in equity, and also in lieu and instead of the right of dowry, homestead and distributive shares in defendant's estate;'' and the acknowledgment in open court of receipt of such alimony in satisfaction of all such manner of right and claim.

Plaintiff put in evidence the paper purporting to be the will of Maurice O'Brien, and the certificate of rejection by the probate court.

On behalf of defendants, the following evidence was offered:

Thomas Joseph O'Brien said: I lived in Oklahoma at the time of the death of my father, Maurice O'Brien; I was at home at the marriage of my sister, Mrs. Daily, six weeks or two months before his death; I came up from Oklahoma at the request of my father to attend her wedding; I stayed about a month; a few days before and some weeks after the wedding; I suppose I was at home a year altogether during the last three years of his life; he always complained about his health before he left Chicago; after we came here he seemed to get better for awhile and then seemed to get worse off; he complained mostly of his head, and his heart used to trouble him a good deal, and his stomach and different things; he had several doctors and he used considerable patent medicines and electric belts and one thing and another; he would try everything to try and get relief; he was not a drunkard, but he drank whiskey; when I came to the wedding and first met him he seemed to be in a great passion; he wandered around and talked to himself a good deal and seemed like he didn't want my sister to get married; he was very sickly at that time and weak; complained of vertigo, getting dizzy, lots of times he would fall down when he was by himself; he was afraid to stay alone after dark; he would go to bed and seemed as though he couldn't sleep; sometimes I heard him talking to himself; lots of times in the daytime he would be walking around and get to

talking to himself; he would go into a passion and in five minutes would be in good humor; when my sister married she went to Monett; my father didn't want her to leave; he wanted her and her husband to live down there at Pierce City at home with him and have Mr. Daily go up and down on the train; my other sister lived in Oklahoma; after my sister married there was an effort made to have my father and mother live together; in 1892, the last time I went to Chicago, he asked me to look at his property there and see what it was worth; agent said $10,000 was a good price; father told me it was worth $40,000; he sold his farm for $4,000, half down; within the last year of his life he told Alice he had provided well for her, and got his will and read part of it to us; he was displeased with the housekeeper he got after my sister left; she was slovenly; on some things his memory was about the same as ever; he used to tell me his memory wasn't good like it used to be; when we lived on the farm my father directed the work; father and mother separated in '85 or '86; my sisters went with mother; then Frank kept house for him; father looked after his affairs himself; I administered on his estate; he had the $2,000 land notes; kept them in the Lawrence County Bank; he had Tom Moore's Poems, Longfellow, Shakespeare and a number of works in Irish; he never told me about making a will while I was there, the time of Alice's wedding; after Alice's marriage I guess she didn't have any care of his house, nor visit him.

Alice Daily said: I am a daughter of Maurice O'Brien; I had lived with my father about two years prior to my marriage; before that I had lived with my mother in Pierce City after their separation; my father sent me to a school in Kansas for one year; after Frank died my other brother stayed with father several months, and he was going away, and father wanted me to stay with him, and I did; he always had a bad stomach and complained of his heart and head; he

would suffer and think he was going to die, then it would pass off and he would be all right; he was restless and would walk the floor; he would wake up and talk to himself; he would talk about whatever was in his mind; what he was talking of with the last person, or what occurred when he was a boy in the old country, or what happened in Chicago; he was excitable; would go out for a walk and when he came back would say he had vertigo; not many people visited him; Father Healey did two or three times a week, and Dr. Worley was his attending physician; complained that he felt tired in church and wanted to get up and walk around; he went out in town nearly every day if he felt well; he would do the shopping for the day; he bought all the things for the house; a few months before I was married he gave me some money; I insisted on his giving me $5 a month wages while I lived with him for my own expenses, dressing, etc.; he gave me $50 after he found I was engaged; a month or two before we were married he wanted to propose to Mr. Daily that we live in his house with him and when I represented to him that wouldn't be practical, Mr. Daily being in business in Monett and it would be necessary for him to live there, he then wanted me to give it up; that Mr. Daily was too old and if I waited a few years I could get other opportunities; and of course I wouldn't do that, and he got angry and made it disagreeable all the time I stayed; I wanted to be married from his house and he refused; he said he disapproved of it altogether and he was going to disinherit me for it; and as I was leaving the house he shook hands with me and asked me to come back and see him; my brother tried to bring about that mother should go back to father, it was all arranged except on the point of remarrying, he wouldn't consent to that, and she wouldn't go back on any other condition; she went to see him the night before he died; when I had wanted arrangements about wages he told me he had provided for me so well in his will I could afford to

wait; that he didn't expect to live long and my brother and me were to have the estate after certain legacies were paid; I refused to stay unless he paid me wages; he gave me the $50 to make preparation for my marriage; after he knew I was going to leave he would talk angry at me and tell me I was doing wrong in leaving him; it was merely my leaving him, he didn't care for us getting married if I would live with him.

On cross-examination: I think a reasonable person would understand that when I was getting married I would have to make a home of my own, and I don't think it was reasonable for him to get up and stamp around and get angry and tell me I was doing wrong and had no right to leave him; my sister and brother were away; he had no wife and was seventy-three and in poor health; he was naturally a man of more than average intelligence on certain things; what he knew, he knew thoroughly; I was married November 7th, and left him a day or two before that; at that time he knew who his children were, and knew what property he had and his memory was good of people and circumstances. He always kept liquor in the house; he would get a gallon at a time and use it, probably half a dozen times a day; he would get every patent medicine he would see advertised.

J. K. Saunders said: I lived next door to Maurice O'Brien; he seemed to have a complication of troubles; head trouble, or catarrh in the head, heart trouble, and his stomach; I really couldn't say as to its having any effect on his mind, any more than that physical debility would have the effect to depress the mind I should think; in the last six months of his life I talked with him every few days and I have seen him when he was cheerful and I have seen him when he was not; I was called over there the night he died; and he was suffering greatly; he asked me to rub his side with whiskey and talked in such a way that it was sometime before I could under-

stand what he wanted me to do; I used it vigorously for five minutes and he was considerably better; an old lady was there who had come to keep house for him after Alice married; he said he was offered as much as $50,000 for his Chicago property; but he had not then heard from his son since he reached Chicago; and another time he heard from him, but couldn't find the parties who had wanted the property; he said he and Frank had got alone nice together; I saw him most every day; he would get excited talking over politics.

On cross-examination:  I am a barber, my office hours were from six in the morning to twelve at night, except meal hours; the night of his death no member of his family was there; three days before that he was down town and fell at the drugstore; he seemed to be very well posted on politics; he would commence to talk intelligently and then get into a frantic rage; I regarded him as a highly educated man; I noted no lack of memory; the night of his death I insisted on remaining the night through and he insisted that I go home and sleep; there was a comfortable fire in the stove; it was a cool night and he asked me to go down stairs and get two sticks of wood in the kitchen and I got the wood.

A. S. Anderson said:  I am a physician; I knew Maurice O'Brien since 1892; he consulted me several times; he was suffering with "lithia" or "lithiasis;" it is a disease caused by poisons in the blood; it manifested itself in various ways; it showed itself in the disordered action of the heart; also in the skin; and this headache he complained of and other troubles were all the result of this disease; he had a deficient memory, very much so; he would frequently come into my office and make the remark to me that he thought he would die before he could get here and when I would go up to the house he would say, "I thought I would die before the night was over;" I hadn't seen him for sometime previous to his death; his mental condition was variable.

"Q. Was it of a sound nature? A. I should say not."

On cross-examination: I don't know that he manifested any want of memory either as to people or property; some of his doings wasn't rational, to my notion; he would conceive the notion that he was going to die, and that wasn't a reasonable conclusion. "Q. If he felt in a general way that he was badly sick and about to collapse, that wasn't irrational? A. I take it this way, that it was the condition of his mind." Lithia at times produces eczema and diseases of the brain, and a number of diseases may be caused by it; outside of those mentioned, inflammation of the joints and neuralgia of the head; I can't give you the proportion of people that are unsound mentally. I don't claim to be an insane expert; I don't mean to tell this jury, when I say that Mr. O'Brien was of unsound mind, that he couldn't remember who his children were and couldn't remember what property he had; so far as I know he was capable of managing his property; I suppose he knew what he was doing when he made his will.

H. V. Worley said: I am a physician, and first called on Mr. O'Brien about eighteen years ago; I treated him at intervals clear up to his death; he had a complication of troubles; lithic acid was one of them, and he was ruptured and had stomach trouble and heart trouble and kidney trouble; they increased as age increased; in the fall of 1890 in a fit of melancholy, he took arsenic with suicidal intent; Dr. Wright was sent for, and we washed out his stomach; during the last eighteen years there was hardly a time when he was not taking medicine; he would continue melancholy at intervals for two or three weeks and then get relief; he would think he was going to die and send for a doctor two or three times a day; I made him a visit on the 17th of November, 1894, and prescribed for him on the 16th; after that I had visited him at intervals clear up to the time of his death; he seemed to suffer a great

deal; wasn't able to be still; would walk the floor and get nervous and impatient; at other times he would get easy and was quite cheerful; he never did any labor to my knowledge since I knew him; he wasn't able on account of his heart trouble; he was taken sick in Armstrong's drugstore and was taken home, and was confined to his bed only a short time until he died; that was after he had that tendency to stagger and fall in the drugstore; he used to complain of vertigo, dizziness and his disease of the stomach, and he would become excited and nervous from those spells and think he was going to die; at times his mind would be in an abnormal condition, at these times when he was suffering from these fits of melancholy and lithic acid poisoning; in such cases the ones nearest to them ought to be their best friends and they usually turn against them; he showed me the plat of his Chicago property and the number of lots.

On cross-examination: "Q. What is the meaning of 'lithiasis?' A. Lithic acid. Q. What does lithic come from? A. I can't tell you. A. Aren't you a Greek scholar? A. No, sir. Q. Did you ever consult Webster on the definition of that word? A. No, sir." He kept his dwelling in fair condition; he was reasonably neat and clean; he was as much so as any man of that age would be; I considered him rather above the average in intelligence; he was a man of good general information; generally speaking he kept posted on current events; I rather enjoyed an argument with him; he was troubled with dyspepsia and was ruptured; I can't say he had heart disease; he had staggering spells from vertigo; I don't know much about his memory; I did not note any lack of memory; I couldn't say I ever saw him in a condition when he was not conscious who his children were; I have seen him in a condition when he was not capable of knowing what he was doing with his property; when he would have a severe attack; I can't remember now at any times when he was in that

condition; I did not know anything whatever about his making a will; from what I saw and know of his condition, I would not say that on November 17, 1894, he didn't then have memory of who his children were; I couldn't say that his mental condition was such at that time that he wouldn't know what property he had.

George Armstrong said: Maurice O'Brien was frequently in my drugstore; I have filled a great many prescriptions for him; he frequently purchased patent medicines and stimulants; he put some papers in my safe and told me it was his will; he got it out about the time his daughter was married; he was very much excited, very much agitated; two or three days after he came back with another and asked me to put it in the safe; he was not excited on that occasion; it remained till after his death; at times he was very irritable and nervous, easily agitated and excited; he was in my store the day before he died and was taken violently sick there; he just dropped over, and I assisted him to a chair; they took part of his clothing off and tried to rub him; he had on four or five wool shirts, I believe they were. "Q. You don't mean to say that at that time he was not capable of understanding and remembering who his children were? A. I would suppose he would. Q. You didn't notice any lack of memory on his part? A. Not that I remember. Q. You don't mean to say that at that time he was in such condition that he didn't understand what property he had? A. I don't know. Q. You had no indication that would lead you to that conclusion? A. No, sir. Q. Any indication to make you think he was not capable of knowing what he was doing with his property if he was making a will at that time? A. I couldn't say."

F. C. Johnson, being recalled by defendants, said: I prepared a will for him not more than a year before this one; I think as to the disposition of his property, I would call him (O'Brien) a monomaniac; I mean by that, a species of insanity on one subject. "Q. He

didn't consider what he was doing, when making his will? A. I think he said he did. Q. Do you mean to say he didn't understand what he was doing? A. I think he did. Q. He understood who his children were? A. I suppose so. Q. Mentioned them by name? A. Yes, sir. Q. And understood what disposition he was making of his property? A. He mentioned in so many words what he wanted, and I would judge that he knew what he was doing. Q. And he explained it to you so that you understood how to make a draft that carried out his intentions? A. I suppose so, else he wouldn't have made it."

With this evidence the defendants closed their case and plaintiff asked the court to give the jury the following instruction:

"The court instructs you that under the pleading and the evidence your verdict must be for the plaintiff and your verdict may be in the following form: We, the jury, do find the paper writing produced in evidence to us to be the will of Maurice O'Brien."

The court refused to give this instruction and the plaintiff excepted to the ruling of the court in so refusing.

In rebuttal, plaintiff offered the following evidence:

E. L. Jerome said: Mr. O'Brien bought the Irish World from me regularly and quite often bought a Globe. He was a man of good intelligence and an interesting talker; he could talk on most any subject; he often mentioned the news of the day.

R. T. Saulsbury, said: I remember of M. O'Brien being poisoned in 1890 or 1891; he said he had some arsenic and had put it on a shelf in the kitchen, and that he had taken arsenic by mistake; that he had aimed to take quinine; Dr. Wright came along in a hurry, and I ran across the field and got there about the time he did, before anything was done; he was all the doctor

that was there; I stayed there till after Dr. Wright had used the stomach pump and relieved him; Dr. Worley was not there at that time; Dr. Wright used the stomach pump and Dr. Worley wasn't there; so far as I know Mr. O'Brien was capable of judgment; he was a man of considerable intelligence; as much so as any one around there.

A. McKinney said: I knew Mr. O'Brien ever since he came to Pierce City up to his death; he was above the average as to intelligence; he was well read and posted; I remember seeing him about November, 1894, and talking to him about his will; he asked me to read a paper; it was in his handwriting and he asked me to read it, and tell him what I thought of it; it wasn't signed; and I told him I thought it was a very well-written document. (Witness was shown the will and said:) I wouldn't be positive but it was similar to that; at that time I noticed no difference in his memory of matters and things and events from any other well-informed person. "Q. In your judgment, at the time he showed you this paper and asked you to read it, was he capable of understanding what he was doing in the way of disposing of his property? A. I certainly thought so."

J. F. Wicks said: I am a grocer; knew Mr. O'Brien fifteen or sixteen years; he traded with me; he was a pretty smart man; a well-read man; what he said was generally to the point; he was a man who did most of the talking himself; he hardly ever let you say much; he was a man that I liked to hear talk; he got most of his goods himself; he attended to his business himself up to his death; I can't say that I saw any indication of failure of his memory.

Thereupon the plaintiff asked the court again to give the following instruction, viz.:

"The court instructs you that under the pleadings and the evidence, your verdict must be for the plaintiff,

and your verdict may be in the following form:   We, the jury, do find the paper writing produced in evidence to us to be the will of Maurice O'Brien.''

Which instruction the court refused to give, and to this ruling of the court the plaintiff at the time excepted.

At the instance of the plaintiff the court gave the jury the five following instructions, viz.:

''1.   You will determine the question whether or not the will produced is the last will of the deceased Maurice O'Brien.   If you find from the evidence in the cause that the said Maurice O'Brien, at the time of the execution of the will, had sufficient understanding and intelligence to transact his ordinary business affairs, and understood what disposition he was making of his property, and to whom he was giving it, then you will find in favor of the validity of the will, and in such case your verdict may be in the following form:   We, the jury, find the will produced to be the will of Maurice O'Brien.

''2.   You are instructed that if you believe from the evidence that the instrument of writing proposed as the will of Maurice O'Brien, was by him signed in the presence of the witnesses, F. C. Johnson and Otis C. Maxey, and that they, at his request and in his presence, subscribed their names as witnesses thereto, and that at the time of signing said instrument he was of sound mind, then you will find it to be the will of Maurice O'Brien.

''3.   The court instructs you that a man has the right to dispose of his property by will, if he chooses, even to the entire exclusion of those, who, but for his will, would be the heirs of his estate, and you are not to consider whether or not the disposition made by the testator, Maurice O'Brien, is appropriate, or, in the opinion of the jury, just, but simply whether the paper propounded as his will be or be not his last will and testament.

"4. If at the time he signed the paper offered in evidence and proposed as his will, if you find from the evidence that he did sign it, Maurice O'Brien had sufficient understanding and intelligence to transact his ordinary business affairs and understood what disposition he was making of his property, and to whom he was giving it, then he possessed a sound and disposing mind; and he had the right to make an unreasonable, unjust and injudicious will, and you have no right, sitting as a jury, to alter the disposition of his property simply because you may think that he did not do justice to his family connections.

"5. The court instructs the jury that in making up your verdict in this case you should not take into consideration or be influenced by the fact that the will was rejected by the probate court or by the judge thereof."

At the request of defendants, the court gave the jury the three following instructions, to the ruling of the court in giving each and every which three instructions, the plaintiff objected and at the time excepted, viz.:

"1. The court instructs the jury that the burden rests on the proponents to prove that Maurice O'Brien, at the time of making the will, possessed a disposing mind, that is, that he had sufficient understanding to transact his ordinary business affairs and understood what disposition he was making of his property and to whom he was giving it. Therefore, if the jury finds the will produced to be not the will of Maurice O'Brien, the verdict may be in the following form: We, the jury, find the will produced to be not the will of the testator.

"2. In determining the issues submitted in this case, you may take into consideration the age of the testator, his physical condition, the manner and circumstances under which he executed the instrument propounded as his will, the provisions of the instrument,

as well as his mental condition as detailed by the witnesses, together with all other circumstances in evidence.

"3.   The court instructs the jury that a disposing mind and memory is a mind and memory which has a capacity for regarding and discriminating and feeling the relations, connections and obligations of family and blood, and that a person may have on some subjects, and even generally, mind and memory and sense to know and comprehend ordinary transactions, and yet upon the subject of those who would naturally be the objects of his care and bounty, and of a reasonable and proper distribution as to them of his estate, he may be of unsound mind.   And if the jury find from the evidence that in making the will in controversy the mind of Maurice O'Brien was controlled and directed by hatred and morbid and insane delusions as to the natural objects of his bounty to such an extent as that he did not comprehend the disposition he was making of his property, then said Maurice was not of sound and disposing mind and memory at the time he made said will."

The question in this case which overshadows all others, and which we think furnishes a solution of it, is as to whether or not Maurice O'Brien was possessed of sufficient mental capacity to make the will at the time he executed it.

The test of capacity to make a will is that the testator must be capable of comprehending all of his property and all persons who reasonably come within the range of his bounty and sufficient intelligence to understand his ordinary business and to know what disposition he is making of his property, and if so he has sufficient capacity to make a will.   [Benoist v. Murrin, 58 Mo. 322; Jackson v. Hardin, 83 Mo. 175; Cash v. Lust, 142 Mo. 630; Sehr v. Lindemann, 153 Mo. 276; Riggin v. Westminster College, 160 Mo. 570.]   "With a capacity reaching this standard and under a free exercise

of it, the court will not interfere with his right to dispose of his property according to his own will, however unjust the disposition may appear." [Cash v. Lust, supra; Thompson v. Ish, 99 Mo. 160; Maddox v. Maddox, 114 Mo. 35; McFadin v. Catron, 120 Mo. 252, and 138 Mo. 197.]

The questions for solution are, did Maurice O'Brien have the requisite capacity to make the will in question, and, was there any substantial evidence to the contrary?

The evidence conclusively shows that he was a man of much more than ordinary intelligence, was quite well educated, and well informed. He went to his attorney to prepare the contents of the will for him, who outlined it for him only a short time before it was signed. It was signed in the same attorney's office on the 17th day of November, 1894. The entire will is in the handwriting of the testator, he having written it from the memorandum made by his attorney in accordance with his wishes and data furnished to him by the testator. He wrote his name to the will in the presence of his attorney, and the presence of Otis C. Maxey, both of whom signed the will as attesting witnesses at his request. He said the paper was his will. He was at the same attorney's office a few days before signing this paper; had made papers of the same kind before about which he had consulted the same attorney about the manner of getting them up, but always wanted to write them himself, so they would appear in his own handwriting.

He told his attorney that he wanted him to prepare another will for him, that he had changed his mind about the disposition of his property, and wanted him to go over it with him and outline another will, which he did in writing in pencil. He mentioned the names of his children, all the parties, devisees and legatees named in the will. He said he wanted his property to go to the parties whose names appear in the will. He knew the names of his children and the other people.

He cut his daughter Mrs. Daily off. He selected Allen, who is a discreet business man as executor, without suggestion from anybody to do so. He was feeble from advanced age, but seemingly not more so than is usual in such cases.

If the facts thus grouped do not show beyond any and all question that the testator possessed the necessary capacity to make the will in question, we must confess our inability to conceive wherein he was wanting. That he may have been unjust to his daughter, Mrs. Daily, in disinheriting her may be true, but with that we have nothing to do. If he was competent to make the will, as we have held he was, he had the right to dispose of his property as he thought proper, in the absence of fraud or undue influence.

It is true that there was evidence that the testator had been in bad health for many years, frequently under the care of a physician, that he would have spells of nervousness and despondency which would last him for two or three weeks at a time, and that during one of these spells in the fall of 1890, four years before he executed his last will, he took arsenic with suicidal intent, but he afterwards stated that he took it by accident, thinking it was quinine.

It is also true that another witness, Dr. Anderson, testified that his mental condition was not of a *sound nature,* but that he had not seen him for some time before his death. F. C. Johnson, being recalled, stated that the testator was a monomaniac, and didn't consider what he was doing when making a will; at the same time he testified that he thought he knew what he was doing when making his will, knew his children, what disposition he was making of his property, and mentioned in so many words what he wanted to do with his property, so that he understood how to make the draft of the will that carried out his intentions. These circumstances had no tendency whatever to show that the testator did not have capacity to make the

will.    In fact, they amounted to nothing; besides, there is not a single circumstance disclosed by this entire record, which shows, or tends to show, in the remotest degree, that the testator was not in full possession of all his mental faculties at the time he executed his will. When his attorney formulated the will he readily gave him the names of all the parties therein named and told him all about his property, and where located.    He was a man of much more than ordinary intelligence, a good scholar, read the papers, was a good conversationalist and attended to his own business up to the time of his last sickness, and was of perfectly sane mind at the time of the execution of the will, and there was no evidence of a feather's weight to the contrary, and, if a will executed under such circumstances will not withstand the assaults of persons disappointed by its provisions, then the statute which authorizes every male person, twenty-one years of age and upwards, of sound mind, to devise his property by last will, amounts to nothing, and should no longer be permitted to remain on our statute as the law of this State.

The evidence of the attesting witnesses and others to the will is sufficient to authorize its probate.    The judgment is, therefore, reversed, and the cause remanded with directions to the trial court to enter a proper judgment confirming the will.

All concur.